IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                  Plaintiff,                  20-CR-27

    v.

ROBERT NOTTO,

                  Defendant.
_____

## DEFENDANT'S AMENDED, CORRECTED SENTENCING FACTORS STATEMENT AND SENTENCING MEMORANDUM

**ROBERT NOTTO,** by and through Anthony M. Bruce, his retained counsel, hereby files his Sentencing Factors Statement and his Sentencing Memorandum asking the Court to sentence him to a term of incarceration of 60 to 72 months. Though 18 U.S.C. § 2252A(a)(2)(A) and 2252A(b)(1), Guidelines section 2G2.2.(a)(2) and the six Specific Offense Characteristics set out in paragraphs 46 through 51 of the Presentence Investigation Report. ("PSIR") suggest that 20 years is an appropriate sentence, the defendant urges the Court to impose a non-Guidelines sentence that is significantly less than 20 years, 60 to 72 months. This Memorandum sets forth the points and authorities upon which Mr. Notto relies in seeking that non-Guidelines sentence.

**IN SUPPORT THEREOF**, it is respectfully shown unto the Court as follows:

1. On May 27, 2020, Mr. Notto appeared before the Court and entered a "guilty" plea to a one-count information that charged him with distributing child pornography in violation of 18 U.S.C. § 2252(A)(a)(2)(A) and 2252A(b)(1). Based on the recently revised sentencing schedule put in place by the Court, he is to be sentenced on September 16, 2020.

2. The sentencing provision of 18 U.S.C. § 2252(A) that applies to the offense of conviction, 18 U.S.C. 2252A(b)(1), requires the Court to impose a minimum sentence of five years and a maximum sentence of 20 years in prison. The Sections of the Sentencing Guidelines that apply to the offense of conviction, §2G2.2(a)(2) provides for a base offense level of 22. However, the six Specific Offense Characteristics that are addressed in paragraphs 46 through 51 of the PSIR drive the adjusted offense level to 46. If the three-point adjustment for Acceptance of Responsibility (Guidelines §3E1.1(a) and (b) are applied, this reduces Mr. Notto's total offense level to 43. Thus, while level 43 calls for the imposition of a life sentence, Section 2252A(b)(1) caps the sentence at 20 years.

3. If this Court or any court was of a mind to simply follow the Guidelines, sentencing in this case would be limited to the Court going through the motions and simply sentencing Robert Notto to 20 years in prison. That, however, that is not the state of the law and, for the reasons stated below, Robert Notto's offense conduct does not warrant a 20 year prison sentence.

**STATEMENT OF THE DEFENDANT WITH
RESPECT TO SENTENCING FACTORS**

The defendant, by counsel, and after a review of the Presentence Investigation Report (hereafter "PSIR"), hereby files notice with the Court and with the Government that it adopts the Presentence Investigation Report in its entirety.

Notwithstanding our adoption of the PSIR, our position, as discussed, *infra,* is that the Sentencing Guidelines for the type of child pornography offense that is charged in this case lack an empirical basis and are, in many ways, duplicative which makes them overly punitive.

## MR. NOTTO'S CONDUCT

Robert Notto is 26. He was approximately 23 when he committed the offense to which he pled guilty and for which he is to be sentenced.  As outlined below and as touched upon in the letters submitted with this memorandum, he was raised in a dysfunctional family under horrible conditions. And while we cannot draw a straight line between his upbringing and his descent into the hell of child pornography, one cannot help but conclude that his upbringing was a major contributing factor into that descent.

We do not dispute the facts of this case, as outlined in the presentence report. Succinctly stated, those facts are:

    a. In March of 2017, Mr. Notto made contact with an unidentified minor (referred to as "MV" in the PSIR and in this memorandum) who resided in the Phoenix, Arizona area. In the course of his contacts with MV, Mr. Notto

        (i)      had a number of sexually explicit online chats with MV after MV reached out to him thus initiating the contact; MV told Mr. Notto that she was "curious" about him after reading his profile.

        (ii)      sent MV three photographs, two of which depicted sexual activity between an adult and a prepubescent female (of between four (4) and six (6) years in age) and a third which depicted a nude female of the same approximate age positioned to display her genital area.;

        (iii)     twice asked MV to take nude photos of herself and send them to him (which MV never did);

        (iv)     sent MV pictures depicting animal torture, bestiality videos, pornography depicting [other] teenagers, pictures of his own penis

and videos of him masturbating and screen captures of his conversations with another individual in which they spoke of torturing and drowning children. (*See* PSIR at ¶¶ 17, 18, 20 and 22).

b.   A subsequent search and forensic analysis of Mr. Notto's computer resulted in the discovery of 70 images and five videos "depicting child pornography and/or suspected child pornography." (*See* PSIR at ¶ 33).

### MR. NOTTO'S BACKGROUND

To say that Mr. Notto is the product of a dysfunctional family is a gross understatement. And, as noted, *supra*, while we cannot draw a straight line from Mr. Notto's upbringing to his involvement in the actions described in the preceding section of this memorandum, this is one of those times that we suggest to the Court is one of those "I know it when I see it" conclusions from *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J. Concurring).

Mr. Notto's parents, Michael Notto and Carol (nee: Piesecki) Notto are divorced.  Their marriage was contentious. The defendant's father has confided to us that he was able to use his job as a New York State Trooper to stay away from the family home for long hours at a time just to avoid the screaming confrontations he and his ex-wife frequently had.  Robert Notto recalls these events as being "like two animals yelling it out."  This verbal environment alone made him anxious and nervous.  The physical abuse heaped on him by his mother, as described in paragraphs 85 and 90 of the PSIR, only heightened his insecure and conflicting feelings.  Robert was the scapegoat child raised by a mother who resented his resemblance to her husband and was physically and verbally cruel to her son.  The chaos of the family home is borne out by the six photographs attached as **Exhibits 1A** through **1F**, all of which present an unimaginable, horrific view of the

place in most people lives that is the center of their universe as they are growing up. A number of years ago, Mr. Notto's oldest sibling,[1] Sara Dievendorf, wrote a letter for him to be used in his parents' divorce proceeding which she has recently re-signed and which is attached hereto as **Exhibit 2A.**  In the letter, she expressed her concern about the environment her mother was creating in which her siblings were being raised.  One of her comments is *"I will never forget the picture of Tori at age 9 cooking on a stove that was taller than her; it was devastating every time I came home to visit.  The dishes were piled high, we had to wash them in the bathroom sink once just to have a pot to boil the noodles in!"*  Robert Notto's mother pitted her children against each other; she seemed to thrive in chaos and drama.  Her mean spirited, dominating, physically abusive parenting has left deep scars in Robert.

Michael Notto, Robert's father, is candid in acknowledging that he is not blameless in some of Robert's early problems and negative experiences that seem to have set a foundation for future poor decision making. Michael Notto has told us "His (Robert's) life was hell."  He acknowledges that his long absences from the home did not serve Robert well.  At the time he thought it was best for his children to not see their parents fight.  He did not realize that they were being treated with such disdain and negligence. Here, we invite the Court's attention to Michael Notto's August 23, 2020 letter attached as **Exhibit 2B** in which he gives his first person account of this history.

Another manifestation of the dysfunction that existed in the Notto home happened with Mr. Notto prior to his adolescent year. At age 11 or 12 he found photographs on the internet for the first time. He was curious about what he saw and heard. That curiosity led to inappropriate sexual experimentation with his younger sister which is described both at ¶42 of the PSIR and in Dr. Heffler's letter (**Ex. 3**). However, this came to a quick halt once discovered by his father. It

---

[1] Michael Notto is Sarah's step-father; Michael Notto considers Sarah his daughter and she considers Michael Notto her father).

has never been repeated as Mr. Notto grew into his teenage, young adult and adult years, and, as pointed out by Officer Zenger at ¶ 99 of the PSIR, Mr. Notto is so ashamed of this impulsive behavior that between the ages of 14 and 16 he engaged in self-harming behavior to punish himself for what he did to his sister.

We know that this information will be troubling to the Court.  However, this episode (1) is isolated; (2) occurred roughly 11 years prior to the defendant's commission of the instant offense; (3) has not been repeated (which was confirmed by a polygraph examination administered by Dr. Heffler) and appears to be more a product of experimentation than of being a central part of the defendant's mental disorder or his course of conduct in this case. Indeed, at ¶ 126 of the PSIR, in the section of his report headed "Factors that May Warrant a Sentence Outside of the Advisory Guidelines System," Officer Zenger states that the fact that there is no evidence that the defendant "has ever had sexual contact with a minor *as an adult*" "may warrant a sentence outside of the advisory Guideline system." (emphasis supplied).

After Michael and Carol Notto's marriage ended, Michael Notto remarried.  By then, Mr. Notto was a teenager.  Mr. Notto's second wife initially seemed to like his children, including Mr. Notto. However, shortly after they were married, she began objecting to them spending too much time in the home.  Indeed, Robert recalled that his step-mother did not like him at all and did little to hide her feelings. Because of this, Michael Notto had Robert move into an unoccupied motor home on his property which was where he was living at the time of the November 16, 2017 search. Michael Notto recognizes that the message this may have given Robert was that he (Robert) was second choice – again, and regrets how he handled the matter.

Fortunately for Mr. Notto, his father has recognized his failures and has been 100% supportive of Robert in trying to help him receive proper treatment and achieve stability. It will be important for Robert to have this stabilizing relationship as he moves forward.

For much of his life Mr. Notto has had to learn to guard against ridicule and derision; after spending time with him we have been able to recognize his sad sense of inadequacy. His frequent use of marijuana and alcohol became the coping strategy he used to deal with this kind of mistreatment to which he had been subjected. Abuse of these substances undoubtedly impaired his judgment, insight and impulse control and caused him to suspend his obligations to make sound decisions.

This is borne out, in part, by the "Mental and Emotional Health" section of the PSIR. At ¶ 99, the Probation Officer relates Mr. Notto told him of engaging in "self-harming behavior" between the ages of 14 and 16 "when [Mr. Notto] realized what he had done to his sister." According to ¶ 100 of the PSIR, in late 2019, Mr. Notto was diagnosed with "disruptive impulse disorder."[2]

Paragraph 97 of the PSIR recites that Mr. Notto voluntarily engaged mental health treatment services with Dr. David Heffler[3] close to two years before he was formally charged in this case. The search of the travel trailer in which Mr. Notto was living was a wake-up call for Mr. Notto. He knew he should not have engaged in the offense conduct he engaged in and wanted

---

[2] Defined by the American Psychiatry Association on its website as a group of disorders that include oppositional defiant disorder, conduct disorder, intermittent explosive disorder, kleptomania and pyromania. These disorders can cause people to behave angrily or aggressively toward people or property. They may have difficulty controlling their emotions and behavior https://www.psychiatry.org/patients-families/disruptive-impulse-control-and-conduct-disorders/what-are-disruptive-impulse-control-and-conduct-disorders#:

[3] Dr. Heffler, who specializes in forensic mental health counseling, is used almost exclusively by the Erie and Niagara County Probation Departments as well as by New York State Parole. Dr. Heffler has been accepted as an expert and has been found to be honest and straightforward in his assessments. We have submitted an August 4, 2020 letter summarizing Dr. Heffler's treatment and assessment of Mr. Notto to the Probation Officer and have been advised that this letter has been submitted to the Court.

to receive treatment to better understand and deal with whatever it was that allowed him to engage in this behavior.

Mr. Notto has been in treatment with Dr. Heffler at Forensic Mental Health Counseling of WNY, PLLC since December of 2017.  We invite the Court's attention to the August 4, 2020 letter from Dr. Heffler to the undersigned counsel for the defendant which we have attached hereto as **Exhibit 3**. In the letter, Dr. Heffler opines that:

> he has consistently taken advantage of our practice policy which permits patients to attend as many additional groups as they wish at no additional cost. For example, most patients are required to attend treatment twice per month for 90-minute group sessions and periodic individual sessions based on treatment status.  Mr. Notto has regularly doubled his treatment attendance, and on occasion, tripled his treatment attendance. (See **Exhibit 3**, Dr..Heffler's Aug 20, 2020 letter). According to Dr. Heffler, he believes that Robert is utilizing the information he has been receiving in treatment and is relied on as a positive group contributor who has above average and meaningful insights.  His letter goes on to say: "He has wedded himself to a life-purpose of elevating the lives of others and to never intentionally cause harm*."* In Dr. Heffler's opinion, *"Mr. Notto does not present with clinical indications of immanent risk to sexually recidivate."* (emphasis supplied).

The Court must not view Robert's progress in treatment as a foxhole conversion.  This is a young man who was broken.  He had been treated like garbage by his mother, the one person most of us depend on to nurture us and guide us.  He had a pervasive sense of unworthiness and unlikability.  Through his commitment to treatment he has turned the corner and is not only improving himself, but also others involved in the therapeutic process with him.

### MR. NOTTO HAS ACCPTED FULL RESPONSIBILTY FOR HIS ACTIONS AND HAS COME TO A FULL UNDERSTANDING OF HIS CRIMINAL CONDUCT

In addition to the progress and commitment Robert Notto has demonstrated in treatment, his full acceptance of responsibility is also demonstrated by his complete candor with U.S. Probation Officer Matthew Zenger.  On July 22, 2020, Mr. Notto signed and forwarded the

following statement to Officer Zenger demonstrating his acceptance of responsibility for his offense

> The first thing I want to do is apologize to young girl from Arizona called "Minor Victim 1" in the complaint, the girl I wrongly corresponded with and exchanged pornographic pictures with. Although I am certain she and her family are not interested in my apologies, I am sorry for any pain or discomfort I have caused them.
>
> I also want to apologize to my father for the pain, shame and embarrassment I have caused him. My unthinking, impulsive behavior has had effects on others that they did not deserve.
>
> Despite my crude and unacceptable interest in child pornography I want the Court and others to know that I have never touched a child or believe I would. I understand this does not minimize my behavior – and at the same time I think it is important to make that known. I have foolishly thought that looking at child pornography and sending inappropriate pictures of myself was not as bad as offenses that involve touching children. In my counseling with Dr. Heffler I have a better understanding of the harm that can be caused in what I did.
>
> I accept complete responsibility for the conduct I pled guilty to. I knew from the start that it was wrong. I knew asking Minor Victim 1 to send pictures of herself was very wrong. The stupid things I told her about things I "did" or knew about were dumb and made up, thinking it would get her to think the things we were talking about weren't so bad. In looking back I see the stupidity in it. I knew I could get into legal trouble by doing all this (I never thought it could be THIS bad) and I did it anyway. I guess my loneliness and lack of self-respect won out.
>
> My treatment with Dr. Heffler has been very helpful. I have developed a better awareness of the long-term effects of child pornography on victims and am ashamed of the role I have had in the past in continuing that victimization. I have learned how to identify my triggers and ways to displace unhealthy urges or interests.
>
> I know I am facing a very lengthy prison sentence. I'm not going to lie, it scares me. I know I will continue to get treatment in prison and I know it will be treatment that will make me a better person. I understand the sex offender registry requirements I will be under for many years when I am released from prison and suspect

> I will face a lot of rejection from people, employers, family members, etc. as a result. I know these are the consequences of my own behavior.
>
> Thank you for taking the time to read this.

As the PSIR notes at ¶ 97, Mr. Notto sought mental health treatment from Dr. David Heffler about a month after the November, 2017 search of the motor home where he lived. Dr. Heffler's opinion, which is based on this period of treatment, stands in stark contrast to the behavior outlined above:

> [I]mportant . . . is [Mr. Notto's] acquisition and utilization of treatment information. He has demonstrated a commitment rarely exhibited by a predispositional sexual offender. He has displayed excellent acquisition of treatment concepts (which focus not only on relapse prevention but significant lifestyle changes) and is always relied upon as a positive contributor to any group he attends. The insights he has shared with others in his treatment are above average and meaningful to others in treatment. Mr. Notto *is well on his way toward not only reducing his sexual recidivism risk*, but also having a meaningful and positive impact on the lives of others. He has wedded himself to a life-purpose of elevating the lives of others and to never intentionally cause harm. (emphasis supplied).

Dr. Heffler continues: He is "aware this will be a lifelong process. Further, Mr. Notto does not present with clinical indications of imminent risk to sexually recidivate" Dr. Heffler's letter backs up what the defendant said in the July 22 statement reproduced, *supra*.

As Mr. Notto says, he knows he is "facing a very lengthy prison sentence [that] scares him." Precisely "why" Mr. Notto engaged in the activities that underly his conviction and are outlined in the PSIR is a question that may never be fully answered. Nevertheless, and at the risk of being overly repetitive, we repeat that the November 16, 2017, search of the motor home in which he was living served as a wake-up call like no other, sent him to Dr. Heffler and put him on

a path that will hopefully steer him far away from the abyss of child pornography and eventually to a place in his life where he will be a contributing member of society.

As noted at ¶ 98 of the PSIR, Mr. Notto has also been fully compliant with the counseling ordered by the Court and has completed that counseling.

Notwithstanding the July 22 letter and its technical impact on Mr. Notto's offense level, we ask the Court to consider the fact that Mr. Notto has never contested his guilt in this matter, and when he received notice that the government was ready to move forward with the case against him, he very quickly retained counsel, negotiated a plea and pled guilty. Throughout this process, and with the exception of the relatively minor incidents reported at ¶¶ 12 – 14 of the PSIR and the incident that led to the August 6, 2020 conversion of his release to house arrest, Mr. Notto has been cooperative with the investigating agents and with the probation department.

### THE CHILD PORNOGRAPY GUIDELINES ARE THE CREATURE OF LEGISLATION, NOT OF THE SENTENCING COMMISSION'S EMPIRICAL STUDIES WHICH, UNDER EXISTING CASELAW, REQUIRES THE COURT TO GIVE DUE CONSIDERATION TO THE FUNDAMENTAL STATUTORY REQUIREMENTS OF § 3553(a)

Congress established the Sentencing Commission "to formulate and constantly refine national sentencing standards," in fulfillment of its important institutional role. *Kimbrough v. United States*, 552 U.S. 85, 108 (2007). The "Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise'." *Id*.at 109. Any review of the evolution of the child pornography Guidelines will demonstrate to the Court that they are simply creatures of legislation and "do not exemplify the [Sentencing] Commission's exercise of its characteristic institutional role." which is the case when the Sentencing Commission does "not take account of 'empirical data and national experience'." *See* <u>Deconstructing the Myth of Careful Study: a Primer</u>

on the Flawed Progression of the Child Pornography Guidelines, Troy Stabenow, January 1, 2009 at 35 (available at https://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2016/report_stabenow.pdf. (Hereafter referred to as "Stabenow"). As Stabenow points out in his article:

> This article . . . demonstrate[s] a number of policy problems with the child pornography guidelines that can be easily put into the record. First, the guidelines have been repeatedly raised despite evidence and recommendations by the Commission to the contrary. Second, repeated Congressional directives were targeted to deter mass producers, repeat abusers, and mass distributors, but this group makes up less than 5% of the defendants effected by the changes. Third, the two-point enhancement for use of a computer is applied to nearly every defendant, but the rationale for creating and continuing the enhancement is rarely present. Fourth, the [then most recent], and most dramatic changes to the Guidelines result not from study by the Commission, nor debate in Congress, but instead by the actions of two unknown authors within the Department of Justice.

Indeed, in *United States v. Pauley*, 511 F.2d 468 (4th Cir 2007) and in *United States v. Baird*, 580 F.Supp.2d 889 (D. Neb 2008)(cited in Stabenow), the courts held that because the child pornography Guidelines were not the product of empirical data, national experience, or independent expertise, they do not satisfy § 3553(a)'s objectives thus providing a basis for courts to vary from these guidelines because of the individual circumstances of the case. *See also United States v. Hanson*, 561 F.Supp.2d 1004, 1011 (D.Wis. 2008), a view that, as we explain, *infra,* is now also the view of the Second Circuit. In short, Congress has attempted to dictate a "lock 'em up and throw away the key" approach to sentencing in child pornography cases which, if followed by the courts, would all-but-dictate that the courts abandon the responsibility they have been given by § 3553(a) to base sentences on the individual circumstances of each case and sentence every defendant to the maximum possible sentence regardless of the circumstances of the case. Here, we ask and urge the Court to look to the § 3553(a) factors in fashioning an appropriate sentence.

As Stabenow concludes in his article, "Child pornography is a pernicious evil . . . [but] unless a defendant [is] a repeat offender, or a mass distributor, the Guidelines yield a sentence 'greater than necessary' to achieve § 3553(a)'s purposes. Stabenow at 38. *See Also,* Vinegrad, *The New Federal Sentencing Law*, 15 Fed.Sent.R. 310, 315 (2003)

In the much-more-recent past, the Second Circuit has essentially echoed Stabenow's conclusions and adopted Vinegrad's conclusions in *United States v. Dorvee*, 616 F.3d 174 (2010) at 184 – 88[4] and more recently in *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017) at 189 -- 90:

> Our conclusion that Jenkins's sentence was shockingly high is reinforced by the important advances in our understanding of non-production child pornography offenses since we decided *Dorvee*. To begin with, the latest statistics on the application of sentencing enhancements confirm that the enhancements Jenkins received under this Guideline are all-but-inherent. In 2014, for example, 95.9% of defendants sentenced under § 2G2.2 received the enhancement for an image of a victim under the age of 12, 84.5% for an image of sadistic or masochistic conduct or other forms of violence, 79.3% for an offense involving 600 or more images, and 95.0% for the use of a computer. *See* U.S. Sentencing Comm'n, *Use of Guidelines and Specific Offense Characteristics (Offender Based), Fiscal Year 2014* 42-43,available
> at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2014/Use_of_SOC_Offender_Based.pdf .
>
> Since *Dorvee*, the Sentencing Commission has also produced a comprehensive report to Congress examining § 2G2.2. U.S. Sentencing Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) [hereinafter "USSC Report"], available
> at http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf . In this report, the Commission explains that it "believes that the current non-production guideline warrants revision in view of its outdated and disproportionate enhancements related to offenders' collecting behavior as well as its failure to account fully for some offenders'

---

[4] The case is cited at ¶ 126 of the PSIR.

involvement in child pornography communities and sexually dangerous behavior." *Id.* at xxi. Since the Commission has effectively disavowed § 2G2.2, it should be clearer to a district court than when we decided *Dorvee* that this Guideline "can easily generate unreasonable results." 616 F.3d at 188.

And, as noted in *Dorvee* at 187:

> [A]dherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories. This result is fundamentally incompatible with § 3553(a). By concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider "the nature and circumstances of the offense and the history and characteristics of Mr. Notto" and violates the principle, reinforced in *Gall*, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct. *See Gall*, 552 U.S. at 55.

## THE SENTENCING GUIDELINES IN THIS CASE ARE DUPLICATIVE AND THUS UNJUSTLY PUNITIVE

Robert Notto's base offense level for Distribution of Child Pornography (he distributed to one person) is 22. For an individual with an offense level of 22 and a Criminal History Category of I the guideline imprisonment range is 41-51 months without acceptance of responsibility; with acceptance of responsibility it is 30-37 months. However, because of the mandatory minimum requirement, in this case the guideline sentence must be 60 months if no specific offense characteristics were applied.

In Mr.Notto's case, incredibly, 24 levels based on six separate Specific Offense Characteristics wind up being added to the base offense level. Section 2G2.2(b)(2) adds two levels if the material involved a prepubescent minor or a minor who had not attained the age of 12. In 2018, 94% of child pornography cases in the country saw this enhancement applied. *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-

statistics/guideline-application-frequencies/2018/Use_of_SOC_Guideline_Based.pdf   (hereafter "Sentencing Statistics")

Child pornography is almost an entirely internet-driven crime making the use of a computer ubiquitous to every child pornography case. When, according to 2018 Sentencing Statistics, this Specific Offense Characteristic (SOC) applied to 94% of the cases, it is clear that the Guidelines have duplicated what is an innate characteristic of the offense as a Specific Offense Characteristic.

Along these same lines, under Guidelines § 2G2.2(b)(4)(B), where the materials depict sadistic or masochistic conduct, 4 levels are applied, yet the Sentencing Statistics reflect that this Specific Offense Characteristic was applied in 61% of the cases in 2018.

Section 2G2.2(b)(7)(C) added 4 levels to the offense level because Mr. Notto had "445 images." This number is deceiving. Mr. Notto had 70 images and five video files. Pursuant to Application Note 6(B)(ii) under Guidelines § 2G2.2, each video file is considered to have 75 images. Thus, since Mr.Notto possessed 70 images and five videos, the Guidelines dictate that the Court consider this as 445 images (5 files x 75 plus 70). In 2018 only 6% of the cases involving Child Pornography had a four-level enhancement for more than 300 but less than 600 images and that is because 75% of the cases had more than 600 or more images. The point is, there are few cases that have less than 10 images, which is where an SOC enhancement for number of images begins. Again, having a plethora of images is present and part of the offense of possession, distribution, and/or receipt of child pornography in most cases because of the manner in which the material is sent.

These are 12 levels that are added to Mr. Notto's offense level, but, as we have pointed out, are inherent in the offense and therefore duplicative.

Mr. Notto also received a seven level increase pursuant to 2G2.2(b)(3)(E) for the offense involving distribution to a minor that was intended to persuade, induce, entice, or coerce, or facilitate the travel of the minor to engage in prohibited sexual conduct.  The offense level is also increased by five levels pursuant to 2G2.2(b)(5) because he is said to have engaged in a pattern of activity involving the abuse or exploitation of a minor.  While we recognize that "technically" the application of these SOCs is correct, it is important to recognize the impact these 12 levels have on his guideline range and the reality that Mr. Notto is being treated in the exact same way as an offender who committed a contact offense would be treated.  This is a classic example of one of the biggest criticisms of the Child Pornography guidelines.  The advisory guidelines as calculated by the U.S. Probation Office, as well as the Government in the plea agreement, do not take into account the reality that as an adult, Mr. Notto never touched a child, was never in the same room with a child, never coerced or threatened a child, never asked a child to travel or planned to have the child travel.  The guidelines make no distinction between Robert Notto and other offenders who have engaged in physical contact with their victims, have subjected children to abuse, have produced pornography, have traded pornography openly and frequently, and planned to engage in sexual conduct with their victims.

Perhaps the greatest irony of the Guidelines as they apply to non-contact child pornography cases is that the agency that promulgates the guidelines, the United States Sentencing Commission, is the first to acknowledge that the current non-production guideline warrants revision in view of its outdated and disproportionate enhancements.  Based on real empirical research, in the USSC Report cited in *Jenkins, supra,* at 188, the Sentencing Commission recommended 2G2.2 be revised to more fully account for the full range of an offender's collecting behavior, the degree of his involvement in a child pornography community, and any history of sexually dangerous behavior.

16

It is these Specific Offense Characteristics that would better reflect the seriousness of an offender's behavior, his or her likeliness to recidivate and promote proportionate sentences that reflect the statutory purposes of sentencing. The facts of Mr.Notto's crime do not include any collecting behavior or involvement in a child pornography community and his only prior history of inappropriate sexual behavior was when Mr. Notto was 11 or 12 years old and pre-pubescent.

**18 U.S.C. § 3553 – FACTORS TO
BE CONSIDERED IN IMPOSING A SENTENCE**

As we have outlined, and although it is stating the obvious, since the Supreme Court decided *United States v. Booker*, 543 U.S. 220 in 2005, to sentence a defendant, the Court's first task is look to the Sentencing Guidelines, which the Sentencing Reform Act of 1984 "requires judges to take account of." However, *Booker* also requires sentencing courts to consider "other sentencing goals," namely, those set out in 18 U.S.C. § 3553(a). *Booker* at 259.  Here, as already noted, the Guideline (singular) range is 20 years in prison. *See* PSIR at ¶ 71. But notwithstanding this "suggested" range, and as the Second Circuit has all-but-directed the lower courts to do in *Dorvee* and in *Jenkins*, the Court must then look to § 3553(a) in determining the sentence. The facts of this is case demonstrate the importance of this Court utilizing its discretion to impose a sentence that is sufficient, but not greater than necessary, to comply with the sentencing purposes set out in paragraph 2 of § 3553(a).

> FACTORS TO BE CONSIDERED IN IMPOSING A SENTENCE.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider
>
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant

17

As important as it is for the Court to understand who Mr. Notto is, it is equally important that the Court understand who he is not. We have outlined the facts of the case, *supra*. We have addressed the struggles Mr. Notto has faced in his early life, including an abusive, neglectful mother whose tirades and penchant for drama damaged Mr. Notto's psyche, a father who made choices that further damaged Robert's fragile ego contributing to a sense of worthlessness, as well as his personal choice to use marijuana and drink alcohol to numb the pain and as a coping strategy. We have addressed the impressive steps he has taken since November of 2017 to improve himself and to understand what his trigger was to engage in the conduct that led to the instant offense. According to Dr. Heffler, Robert's work in this area appears to have been remarkable. He has fully engaged in a treatment plan and appears to be a positive asset to others involved in group counseling.

With the exception of the incident with his sister that took place when Robert was very young, pre-pubescent and presumably sexually curious, there is no indication that he has ever been involved in predatory or sexually deviant behavior. As an adult, and since at least age 13, if not younger, he has never engaged in any inappropriate touching of a child. His sole contact with the minor victim, MV, was via a computer. He did not threaten the minor victim. He did not abuse a position of trust. He never coerced or intimidated the minor victim, in fact, investigative material indicated the minor victim felt "kinda sorry for him."

Mr. Notto's conduct was all online. He committed his offense from the isolation of the motor home parked next to his father's home, the motor home to which he had been exiled when he was rejected by his stepmother. Feeling very alone, unloved, and intimidated at the thought of rejection by another woman, he used social media to connect to a person in an age group he saw as less threatening to him. He lacked any semblance of sophistication in the manner in which he

committed his offense.  Although he initially lied about his age, he used his real name, and made it very easy for the minor victim to figure out where he lived and who he was.  In fact, the minor victim showed a higher level of savviness by never using her real name.

As reflected by the PSIR, Mr. Notto did not have a vast or well-organized collection of child pornography. He did not have images organized or cataloged, a trait the Sentencing Commission has identified as often indicative of a higher level of predatory interest.  He also did not have images on multiple devices.  In fact, as the Court knows from dealing with other non-contact child pornographer offenders, he did not have many images/files. He was not involved with any groups of like-minded individuals who traded child pornography, shared "tips of the trade" or engaged in group discussions.  He has not engaged in predatory behavior as an adult with any child or other adult. These three characteristics, specifically identified by the Sentencing Commission as being more relevant in reflecting the seriousness of an offender's behavior and the likelihood of recidivating, are entirely absent in this case.

Mr. Notto's father and Dr. Heffler currently provide him with a good support system. He has demonstrated a genuine and authentic commitment to continuing the treatment process. With the exception of a marijuana conviction (that was based on marijuana seized from the motor home during the November, 2017 search in this case) Mr. Notto does not have a criminal record.  He has never been in jail.

### U.S.C. § 3553(a)(2): The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law and to provide just punishment for the offense

Mr. Notto's acceptance of responsibility statement demonstrates that he recognizes the seriousness of his offense. Other than the conduct that underlies this case and his marijuana conviction, Mr. Notto has been living a law-abiding life and has strong respect for legal authorities.

This comes as no surprise as his father was a New York State trooper for over 30 years. "Just punishment" is a difficult phrase to define. How much time is enough time, especially when the very body that established the sentencing guidelines recognizes the unfairness of the child pornography guidelines. Punishment for individuals convicted of child pornography offenses is often far more severe than for almost any other crime – including murder. Mr. Notto not only is subject to a mandatory minimum term of incarceration, but the Court must also order him to serve a term of post release supervision of up to life. Unlike any other type of offender, Mr. Notto will be subject to numerous monitoring conditions. As the Plea Agreement recites, Mr. Notto could even be subject to civil confinement. He will be required to register as a sex offender in the community where he lives, works and/or goes to school. For a first-time offender like Mr. Notto, who has none of the characteristics that are indicative of a predator or recidivist, any sentence substantially longer that the five-year mandatory minimum term of imprisonment would, we submit, be greater than necessary to meet the goals of § 3663(A)(2).

**(B)** to afford adequate deterrence to criminal conduct;

Mr. Notto has been on fairly strict pretrial supervision since his initial appearance. While his time under supervision has not been perfect, he has not re-engaged in any type of deviant sexual behavior and he his has fully invested himself in the treatment process. There is no reason to suspect he will not continue to do the same. He is both deeply ashamed of his actions and humiliated by them.

**(C)** to protect the public from further crimes of the defendant;

In addition to the largely self-imposed safeguards outlined above, the probation officer has indicated that he will recommend the many "Special Conditions" that appear at pages 22 and 23 of the PSIR. These conditions, which Mr. Notto does not and will not oppose, will further form a

safety net. These conditions, by their very nature, will substantially limit Mr. Notto's post-incarceration freedom. They will limit where he can live, with whom he may associate, with whom he must have supervision in order to associate, limit access to a computer and other electronic devices, and monitor what he does while using those devices.

### 18 U.S.C. § 3553(a)(6) – the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct

One of the driving forces in child pornography cases is how the Government chooses to pursue and charge them. For instance, the Government could charge a person with possession of child pornography for which there is no mandatory minimum, or they could charge them with receipt of child pornography, which has a mandatory minimum. It can be argued (circuitously) that in order to possess one must receive and if one receives then they possess. Distribution could be casually sending pornographic images to one person or it could be sharing within a large community of other child pornographers engaged in far more sinister and egregious conduct. In either case, the offender would be subject to the exact same penalties. Too often in child pornography cases, there is little or no differentiation made between the first-time-no-contact offender and the repeat, predatory offender. It is also a conundrum as to why some defendants are dealt with more leniently than others when they have engaged in very similar conduct, and sometimes in even more egregious conduct.

By way of example, outlined below are three cases from this district to which we invite the Court's attention that demonstrate how an unwarranted disparity might occur in this case.

*United States v Shelby Garigen* (19CR00206). The defendant was a 43-year-old woman who was the club trainer for a boys' soccer club in Western New York. She exchanged nude photos with two 17 year-old team members and made arrangements to meet with one of them to engage in sexual intercourse (at that point investigators were involved so unbeknownst to the

defendant, she actually texted with an undercover agent).  In what appears to be a charge bargain, the defendant was allowed to plead to an infrequently used statute, 18 U.S.C. 2252A(a)(5)(B), Access with Intent to View Child Pornography.   Section 2252A(a)(5)(B) has no mandatory minimum and results in a guideline range of 37-46 months (the plea agreement allowed her to request a non-guideline sentence).

Shelby Gerigen is a woman and her two victims were 17year-old males. These two facts seem to be the only facts that set Ms. Garrigan apart from Mr. Notto. Indeed, arguably Ms. Garigen's conduct was more egregious in that she abused a position of trust as a trainer and made arrangements to meet to engage in intercourse with a minor.  Ms. Garigen's sentencing has been postponed numerous times and is now scheduled in Judge Arcara's part for November 5, 2020. The charge bargain in that case – the government's own actions – thus create the disparity.

*United States v. Brett Schultz* (17CR00193). On March 7, 2018, this Court sentenced the defendant to 87 months in federal prison.  Mr. Schultz's conduct was similar to Robert Notto's, but his intent was, we submit, far more egregious that Mr. Notto's.  He engaged in sexually explicit on-line chats with an undercover agent who Mr. Schultz *thought* was a 16-year-old girl.  He sent the "girl" photos of himself nude and coached her how to perform sex acts.  Mr. Shultz took it a step further than Mr. Notto by making arrangements to meet the "girl" and showed up at the site with a condom (clearly exhibiting his intent to have intercourse with the minor "girl").   The defendant pled guilty to Attempted Receipt of Child Pornography. There may be some nuances between Mr. Schultz' case and Mr. Notto of which we are unaware, but they would have to have been slight. However, these nuances, whatever they may have been, are outweighed by the defendant's intent to actually engage in a sexual act with a minor. Such conduct is far more egregious than Mr. Notto's.

*United States v. Scott Myers* (17CR00244). In January of 2019, this Court sentenced Scott Myers, age 26, to 60 months (5 years) incarceration. Mr. Myers had pled to Receipt of Child Pornography; he met a 14-year-old female (Victim), on an internet dating site and the two eventually began communicating via text messaging on Kik and Skype. The communications, which were sexually explicit in nature, included Myers requesting sexually explicit photos from the victim which the victim sent and which the defendant stored on a thumb drive. A subsequent analysis of the thumb drive revealed approximately nine images of child pornography depicting the victim. Myers was aware that the Victim was a minor at the time she sent the sexually explicit images. In addition to the thumb drive, Myers also possessed other electronic media which contained child pornography, including a cellular telephone, two laptop computers, and a tablet. The defendant also engaged in online sexual communications with another minor, a 13-year-old female, using Kik and text messages. This case appears to be very similar in nature to Robert Notto's case, including the ages of Mr. Notto and Myers when they engaged in their criminal behavior and when they were sentenced and the ages of the victims.  Both men received sex offender treatment from Dr. Heffler, although Mr. Notto began his engagement separate from the filing of a criminal complaint and seems to have fully committed to the therapeutic process whereas the Government cited a number of concerns with Mr. Myers' treatment assessment.   If there is a nuance between the Myers – Notto cases it would be in Mr. Myers' "collecting" behaviors which appear to have been more egregious than Mr. Notto's.

## CONCLUSION AND REQUEST FOR
## A VARIANCE TO A NON-GUIDELINE SENTENCE

In *Dorvee*, the Second Circuit stated the obvious: that strict adherence to Guidelines § 2G2.2 in every case would result in no distinctions between the sentences imposed in the most aggravated child pornography cases and run-of-the-mill child pornography cases. In *Jenkins*,

decided seven years after *Dorvee,* the Second Circuit, relying on the Sentencing Commission's own 2012 report, all-but-released district courts from the requirement that they march in lockstep to Guidelines § 2G2.2, in essence, telling the district courts to sentence child pornography offenders by applying the § 3553(a) factors using the same approach they would use in any other case. In other words, impose individualized sentences on individual offenders. That approach in this case calls for a sentence of sixty to seventy-two months.

This case represents a short term, relatively isolated incident. Robert Notto had no criminal record prior to the November 2017 search of the motor home to which he had been exiled. As an adult, Mr. Notto has never physically victimized anyone.  It is only because of his own candor and honesty with his therapist, the probation officer and the defense team that we know that he engaged in the curiosity-driven sexual exploration with his younger sister when he was pre-pubescent.   The calculated guideline range, which is capped at the statutory maximum sentence, yields a recommendation that is far greater than necessary in light of the sentencing factors set forth in 18 U.S.C. 3553(a), the Sentencing Commissions guidance as to what issues should be considered in sentencing non-production, non-contact sex offenders and the general judiciary response to child pornography cases that do not involve contact.  Over 70% of these cases are sentenced far below the advisory guideline range.   Unfortunately, the guidelines, in their current status, make no distinction between low to moderate risk offenders like Mr.Notto and the most dangerous offenders, including those with prior predatory convictions.

We are well aware that the sentence we are asking the Court to impose is significantly below the statutory maximum sentence, which is also the advisory guideline sentence.  However, a 240-month sentence in this case[5] is far longer than necessary to achieve the sentencing goals of

---

[5] If the Bureau of Prisons places Mr. Notto in its Sex Offender Treatment Program, he would not enter that program until toward the end of his sentence. Thus, if the Court were to impose, by way of example, a twenty-year term of

§ 3553(a).  Mr.  Notto has never been incarcerated.  He has been actively engaged in an effective therapeutic milieu which is making a positive and life changing difference.   Five years in prison is a long time for a first time, non-violent offender.  It is our position that Robert Notto's facts are very similar to Scott Myers' facts and therefore submit that a sentence of 60 months and no more than 72 months is fair, just and reasonable and is sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of § 3553(a).

Respectfully submitted,

Dated:   August 28, 2020                          /s/Anthony M. Bruce
                                                  Anthony M. Bruce, Esq.
                                                  Andreozzi Bluestein LLP
                                                  9145 Main Street
                                                  Clarence, New York 14031
                                                  Tel. No.: (716) 565-1100
                                                  Fax No.: (716) 565-1920
                                                  Email: amb@andreozzibluestein.com

---

imprisonment, Mr. Notto would not enter this program for many, many years, thus leaving the many years in between the commencement of Mr. Notto's sentence and his acceptance into the program as strictly punishment that would not benefit anyone.