IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA,

          v.                          20-CR-00027-WMS

ROBERT NOTTO

             Defendant.

───────────────────────────────

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S SENTENCING MEMORANDUM

The United States of America by and through its attorney, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and the undersigned Assistant United States Attorney, hereby files its response to the defendant's sentencing memorandum.

## PRELIMINARY STATEMENT

"Child pornography harms and debases the most defenseless of our citizens." *U.S. v. Williams*, 553 U.S. 285, 307 (2008). This is true whether the defendant is producing, distributing, receiving, or possessing child pornography. It is true because, regardless of the defendant's assumed role in this insidious underworld, he directly contributes to the continued harm of children. Real children. Children who will live with the horrors of the abuse and the knowledge that at any given minute in a day, thousands of people are viewing their bodies being violated in unspeakable ways.

Child sexual exploitation cases run the gamut from possession to production to hands-on contact. This case falls in the middle. In this case, the defendant conversed with an actual

minor victim for months. The defendant begged the minor to send him photographs and participate in video chats with him. The defendant encouraged the minor to find a babysitting job where she could molest children for him. The defendant detailed how he supposedly performed sexual acts on his sister. The defendant expressed his desire to travel to the minor victim to perform sexual acts on her. The defendant distributed child pornography to the minor in order to entice her to engage in sexual activity. And, now, the defendant requests a significant downward variance at sentencing — from 240 months to 60 to 72 months. The government opposes this colossal variance request and contends that this defendant should be sentenced to a significant term of imprisonment.

## FACTUAL BACKGROUND

On November 14, 2019, the defendant was charged pursuant to a criminal complaint with violations of 18 U.S.C. §§ 2252A(a)(2)(A) (distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography), and 2422(b) (enticement of a minor). *See* Docket Nos. 1-2. On May 27, 2020, the defendant pleaded guilty to one count of distribution of child pornography. *See* Docket Nos. 22-23.

The defendant presents a skewed and sanitized version of his conduct — to which he devotes approximately a page-and-a-half — in his sentencing memorandum. *See* Docket No. 34 at 3-4. In so doing, the defendant presents himself as merely a troubled young man plagued by childhood dysfunction who only dabbled in a few images of child pornography. Worse still, defendant makes only a passing reference to "sexually explicit conversations," which color the true extent of defendant's conduct in this case. The defendant further deflects responsibility in subtly shifting blame to the Minor Victim when he states that he "had a

number of sexually explicit online chats with MV after MV reached out to him thus initiating the contact; MV told Mr. Notto that she was 'curious' about him after reading his profile." Docket No. 34 at 3.  Put simply, to appropriately sentence this defendant and comport with 3553, the Court must understand the full scope of defendant's conduct.

In March 2017, the defendant met a thirteen-year-old female child ("Minor Victim 1") on the internet through a teen social network.  The defendant, then twenty-three-years old, told Minor Victim 1 that he was "into DDLG (Daddy Dom, Little Girls), torture, and a plethora of other kinks."  *See* Docket No. 1 at 2.

Beginning March 13, 2017 and spanning through July 2017, the defendant engaged Minor Victim 1 in disturbingly lewd, lascivious, and abusive conversation.  This conversation included, *inter alia*, imploring Minor Victim 1 to send him photographs of her vagina, encouraging Minor Victim 1 to seek a babysitting job where she could molest and photograph the children at the defendant's direction, stating that defendant desired to meet Minor Victim 1 and perform sexual acts on her, and sending child pornography to Minor Victim 1.  Below are excerpts of the conversation between defendant and Minor Victim 1:

- "I would love to see your perfect very young pussy . . . but honestly daddies just love finding one girl, then giving them all his attention."  (March 13, 2017)
- "Tease daddy with your tight young parts."  (March 15, 2017)
- "I actually need you to go to the bathroom and spread your legs wide so daddy can see your princess parts."  (March 16, 2017)
- "If you lived in New York and let me, I'd rape you . . . . I'd literally tie you up and force you to eat her 3yo pussy."  (March 16, 2017)
- "You're pedo candy" (March 16, 2017);
- "I'll make her suck me after if you want. . . . Would you wanna watch/listen?  If you do I'll wait till you get out of school.  And you'd hear her cry or say no . . . as I force it in her ass."  (March 16, 2017)

- "I wish you were closer . . . I'd see if you'd really meet me . . . give you fantastic sex (when you let me) and cook for you." (March 17, 2017)
- "too bad you didn't have a little sis . . . would've made you use her by now if you already hadn't done it" (March 18, 2017)
- "Also you should consider babysitting.  Babygirl I bet you'd find a job with a little girl. That would be insane lol." (March 18, 2017)
- "I wish I could see your baby pussy Soo bad." (March 19, 2017)
- "Even if you just stood up and took a pic I bet it's smooth and pink." (March 19, 2017)
- "I'd do anything to fuck a young girl." (March 19, 2017)
- "Daddy needs your baby pussy." (March 20, 2017)
- "Wish you had a lil sis we could be having fun together." (March 22, 2017)
- "I wish you had a little sis that looked up to you and would be easy to molest." (April 10, 2017)
- In response to Minor Victim 1 saying her mom told her to be a babysitter, "[b]abygirl I told you to do that.  I told you I'd do absolutely anything if you ever sent me pics of the girls.  Imagine peeing in a sippy cup or baby bottle and making them drink." (April 10, 2017)
- "Would you ever had fun like maybe dressing her like a slut or molesting her . . . if daddy told you exactly what to do? . . . I'd love to tell you what to do, and make you get her to drink pee." (April 10, 2017)
- "If you're ever with her again please take pics of her . . . . itd be cute to see her puffy pussy lips . . . or just the fact that you'd be molesting her for me." (April 11, 2017)
- "And even if we aren't talking when you do, take pics of the sluts ok? Bent over spread eagle or licking you." (April 11, 2017)
- "Believe me if you were here I'd lick you for 5 mins and get you soaked before entering your puss.  Then I'd cum deep in your baby puss and fill you up.  Even make you molest my sis before you left." (May 1, 2017)
- "I've been single a long time and my sis can only suck and even then its barely an inch of it.  I wanna fuck a soaking wet pussy." (June 2, 2017)
- "I wish you had a little sis . . . . I'd Soo be more demanding." (June 2, 2017)
- "You just make me wanna molest you so I try to get you to makes me cum and all that. I still REALLY want you to be the bestest little girly ever and babysit for me." (June 2, 2017)
- "If you did that shit and you liked me and wanted me to I'd literally drive to you and if you like me take you wiff me . . . we could live together." (June 2, 2017)
- "Prove you really will be daddy's little sub. I would drive to you whenever you were finally ready to be my wittle girly." (June 2, 2017)
- "I want you to babysit . . . And blindfold a girl and see if you get soaked when you feel her inexperienced lips and tongue touch you." (June 5, 2017)

- "Wish you'd babysit . . . or had a little sis. . . . Or play on camera with me . . . I'd love to see your underage pussy one day if you ever want to tease . . . Show me your puss then call me." (June 27, 2017)
- "I think you should babysit . . . I was really turned on today by the stories 0.0 of it's too hard that's fine but idk would be hot if you did it." (June 29, 2017)
- "Would you get wet seeing a little toddler baby get cummed on?" (July 29, 2017)
- 

This is all to say that although defendant pleaded guilty to distribution of child pornography, the context in which he did so is equally important. To call these statements "sexually explicit" is an understatement and a misnomer, lending an imprimatur or normalcy and legality to something so egregiously beyond the pale. To the contrary, these statements represent this defendant's sexual interest in children — an interest upon which he has acted in the past with his sister. As such, the government opposes the defendant's request for 60 to 72 months and contends that, based on the conduct described above, the defendant should be sentenced to a substantial prison term.

## **ARGUMENT**

## I.    **DEFENDANT'S BACKGROUND DOES NOT DISTINGUISH HIM FOR PURPOSES OF THE SIGNIFICANT VARIANCE HE REQUESTS.**

In his sentencing memorandum, the defendant devotes a substantial amount of time to describing his background. *See* Docket No. 34 at 4-8. He states that "while we cannot draw a straight line from Mr. Notto's upbringing to his involvement in the actions described in the preceding section of this memorandum, this is one of those times that we suggest to the Court is one of those 'I know it when I see it' conclusions." *Id.* at 4. The defendant then describes familial dysfunction, including parents fighting and alleged "negligent" care by his mother. In addition, the defendant blames substance abuse problems for his conduct alleging that "abuse of these substances undoubtedly impaired his judgment, insight and impulse control and caused him to suspend his obligations to make sound decisions." *Id.* at 7. Finally,

5

the defendant asserts that he has suffered from mental health issues, including disruptive impulse disorder and self-harm.

Although the government is sympathetic to the defendant's early plight, his background does not warrant the variance he requests. The Sentencing Guidelines state that "[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted." USSG § 5H1.12. Similarly, the Sentencing Guidelines provide that "[d]rug or alcohol dependence or abuse ordinarily is not a reason for a downward departure. Substance abuse is highly correlated to an increased propensity to commit crime. Due to this increased risk, it is highly recommended that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program." USSG § 5H1.4. Finally, mental health conditions should only be relevant in determining if a lesser sentence is warranted if the condition is "present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.3. Neither the PSR nor the defendant's sentencing memorandum gives any basis to conclude that any mental health issue the defendant suffered was present to such an unusual degree that it would distinguish his case from other similar cases.

Put simply, a difficult childhood, dependency issues, and mental health issues do not distinguish this defendant from the scores of other defendants committing similar crimes. In fact, this court routinely encounters defendants with much worse backgrounds, worse dependency issues, and worse mental health ailments than this defendant. More importantly,

however, a difficult childhood, dependency issues, and mental health ailments do not justify the conduct in which the defendant engaged.  Nor do such issues propel a person to seek images of toddlers being sexually abused, to encourage a minor to molest other minors, and to sexually abuse his own sister.  The defense's invitation to the Court to "know it when it sees it," when it comes to correlating the defendant's upbringing to his abuse, although perhaps attractive and easy, is dangerous and unfair.  Accordingly, the Court should reject the defendant's request for the variance and sentence him to a significant term of imprisonment.

## II.   DEFENDANT'S ACCEPTANCE OF RESPONSIBILITY DOES NOT ENTITLE HIM TO THE SIGNIFICANT VARIANCE HE PROPOSES.

The government does not contest that the defendant has accepted (at least some) responsibility for his actions in this case.  He demonstrated such acceptance by pleading guilty.  The government, however, is troubled by the blame-shifting arguments the defendant presents in his sentencing memorandum.  At points he hides behind "loneliness and lack of self-respect" (Docket No. 34 at 9), at others he seeks to share blame with Minor Victim 1 (Docket No. 34 at 19 ("In fact, the minor victim showed a higher level of savviness by never using her real name.")), and still at others cowering behind the screen (Docket No. 34 at 18 ("Mr. Notto's conduct was all online . . . . Feeling very alone, unloved, and intimidated at the thought of rejected by another woman, he used social media to connect to a person in an age group he saw as less threatening to him.")).  The defendant repeatedly distances himself from and minimizes his conduct in this case by stating what he did not do.  For example:

- "Despite my crude and unacceptable interest in child pornography I want the Court and others to know that I have never touched a child or believe I would.  I understand this does not minimize my behavior – and at the same time I think it is important to make known."  Docket No. 34 at 9.

- "Mr. Notto never touched a child, was never in the same room with a child, never coerced or threatened a child, never asked a child to travel or planned to have a child travel." Docket No. 34 at 16.
- "The facts of Mr. Notto's crime do not include any collecting behavior or involvement in a child pornography community and his only prior history of inappropriate sexual behavior was when Mr. Notto was 11 or 12 years old and pre-pubescent." Docket No. 34 at 17.
- "His sole contact with the minor victim, MV, was via computer. He did not threaten the minor victim. He did not abuse a position of trust. He never coerced or intimidated the minor victim, in fact, investigative material indicated the minor victim felt 'kinda sorry for him.'" Docket No. 34 at 18.
- "Mr. Notto's conduct was all online. He committed his offense from the isolation of the motor home parked next to his father's home, the motor home to which he had been exiled when he was rejected by his stepmother. Feeling very alone, unloved, and intimated at the thought of rejection by another woman, he used social media to connect to a [CHILD] in an age group he saw as less threatening to him." Docket No. 34 at 18.

The defendant received a three-level downward departure for acceptance of responsibility.

He is not entitled to a further downward variance on this basis.

## III.   NEITHER *UNITED STATES V. DORVEE* NOR ITS PROGENY SUPPORT THE SIGNIFICANT VARIANCE DEFENDANT SUGGESTS.

The defendant contends that because the sentencing guidelines dictate, in his opinion, unduly harsh penalties for his conduct, he is entitled to a downward variance. This argument fails for a number of reasons as discussed below.

### A. The Defendant's Criticism of the Sentencing Guidelines Does Not Entitle Him to the Downward Variance He Requests.

In his sentencing memorandum, the defendant criticizes the evolution of the § 2G2.2 sentencing guideline applicable to the defendant, and urges this Court not to give deference to the guidelines. In making this assertion, the defendant neglects to consider the full history behind the 1991, 1996, 2003, and 2004 amendments to § 2G2.2. The history of those

amendments demonstrates that § 2G2.2 is the product, not only of the Commission's institutional expertise, but also of thoughtful Congressional oversight.   While a full accounting here of the legislative history would be overly voluminous, the following details drawn from the legislative history exemplify Congress's and the Commission's exercise of their proper institutional roles during those periods.   In particular, the history reflects Congress's study of the sources and harms of child pornography, as well as the Commission's involvement.

In initially formulating § 2G2.2, the Commission reviewed past sentencing practices as set forth in § 1A1.1(3).  After the statutorily mandated 180 day period of review, the original sentencing guidelines became effective November 1, 1987.   Later, in response to the Commission's proposed 1991 revisions to the child pornography guidelines, including § 2G2.2, Congress enacted its first directive to the Commission, but before rejecting the Commission's proposed revisions, the Senate and the House considered extensive data and testimony.[1]   137 Cong. Rec. S10322-04; 137 Cong. Rec. H6736-02.   That Congressional action clearly was informed by thorough factual research.  Furthermore, the staff of the House of Representatives conducted a point-by-point response to concerns voiced by the Commission, which was included in the House legislative records.  137 Cong. Rec. H6736-

---

[1] This data and testimony included the 1986 Report of the U.S. Congress Permanent Subcommittee on Investigations on Child Pornography and Pedophilia, testimony and submissions from the National Coalition Against Pornography, the National Law Center for Children and Families, the National Coalition for Children's Justice, the National Obscenity Enforcement Unit,  Department of Justice attorneys and staff, Southern California Child Exploitation Task Force, Exploited and Missing Children Unit, the Badgley Report from 1984 (linking child molestation with juvenile and adult prostitution), the Surgeon General's Workshop on Pornography, Morality in the Media, the Religious Alliance Against Pornography, and academics and writers such as Ann Burgess (a professor at the University of Pennsylvania with a federal grant to study child pornography), David Duncan (a professor at Southern Illinois University), Judith Reisman (studying pseudo child pornography), David A. Scott (author of In Pornography; A Human Tragedy), and Don Feder (from the Boston Herald), all of which were adopted into the record.

02 at 6739-40.   That exchange highlights how the different institutional perspectives of Congress and the Commission guided the development of § 2G2.2.  Ultimately, in accordance with its authority under 28 U.S.C. § 994(p) to "modif[y]" a proposed amendment, Congress approved an amendment to the Treasury Postal Service Appropriations Bill of 1991, which directed the Commission to make certain revisions in § 2G2.2, as well as other guidelines. That amendment was approved by the Senate and House, and enacted in Section 632 of Pub.L. 102-141. Treasury, Postal Service and General Government Appropriations Act of 1992, Pub.L. 102-141, 1991 HR 2622.  Interestingly, in Section 632(1)(C), Congress amended the guidelines to address the amount of child pornography in a defendant's possession: "Pursuant to its authority under section 994 of Title 28, United States Code, the Sentencing Commission shall promulgate guidelines, or amend existing or proposed guidelines as follows: ... Guideline § 2G2.4 [shall] ... provide at least a 2 level increase for possessing 10 or more books, magazines, periodicals, films, video tapes or other items containing a visual depiction involving the sexual exploitation of a minor."  *Id.*

Changes in 1996 to § 2G2.2 and the guidelines relating to child pornography likewise reflected a process of thoughtful Congressional analysis and proper institutional cooperation.[2]

---

[2] In 1996, when increasing punishment for child pornography offenses, Congress made the following findings as to the reasons for H.R. 1240:

SUBSECTION 1. FINDINGS.

Congress finds that-

(1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

(2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years;

(3) child pornography is often used as part of a method of seducing other children into sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children "having fun" participating in such activity;

For example, in 1995 the House Judiciary Committee Report found that computer transmission of child pornography presented a significant threat to children:  "Distributing child pornography through computers is particularly harmful because it can reach an almost limitless audience." H.R. Rep. 104-90 at 3.  Congress also "found that as the use of computers and the use of electronic communications increase ... it has, unfortunately, also increased for criminal use, including the sale of pornographic materials ... of children."  141 Cong. Rec. H4122-01 at H4123.  *See also*, 141 Cong. Rec. S5509-02.[3]  As a result, Congress sought not

---

(4) child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children; such use of child pornography can desensitize the viewer to the pathology of sexual abuse or exploitation of children, so that it can become acceptable to and even preferred by the viewer; ...

(7) the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come ...

(10)(A) the existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and

(B) it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials;

(11)(A) the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and

(B) this sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children;

(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children; and

(13) the elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct, including both photographic images of actual children engaging in such conduct and depictions produced by computer or other means which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children engaging in such conduct.

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT of 1997, PL 104 208, 110 Stat 3009, Section 121 (September 30, 1996).

[3] During the debate in the Senate, Senator Grassley specifically spoke about the need to make penalties for various violations of child pornography statutes stronger with the use of computer:

H.R. 1240 seeks to enhance prison time as well as fines for child pornographers who use computers to trade in child pornography. I believe that this penalty enhancement is an important measure and the Grassley Hatch Thurmond amendment merely clarifies what the House intended to do in order to remove any possible confusion in the future.

only to toughen penalties for child pornography and child exploitation, "two of the most horrendous and repulsive crimes that can possible exist ... [that] can ruin a young person's life virtually at the time it has begun," but also to address the impact of the rise of Internet usage on these crimes. 141 Cong. Rec. H4122-01 at H4123. It therefore enacted the Sex Crimes Against Children Prevention Act of 1995 ("SCACPA"). Pub. L. 104-71, 1995 HR 1240, 109 Stat. 774. In SCACPA, Congress directed the Commission to increase the base offense level for offenses under 18 U.S.C. §§ 2251 and 2252 by at least two levels and to increase the base offense level by at least two levels for offenses committed under 18 U.S.C. § 2251(c)(1)(A) or §§ 2252(a)(1)-(3) when a computer was used to "transmit the notice of" or "transport or ship" the images. *Id.* Effective November 1, 1996, the Commission amended § 2G2.2 to "implement[] the congressional directives" in SCACPA, as well as to address variations in courts' application of the enhancement for a "pattern of activity involving sexual abuse." *U.S. Sentencing Guideline Manual*, App. C, Amendment 537 (1996).

Notably, SCACPA also required the Commission to "submit a report to Congress concerning offenses involving child pornography and other sex offenses against children" within 180 days. Sex Crimes Against Children Prevention Act of 1995, Pub. L. 104-71, 1995

---

Computers are now the preferred business forum for child pornographers. Due to modern technology, predatory pedophiles sell, purchase and swap the most vile depictions of children engaged in the most outrageous types of sexual conduct.

Simply put, child pornography on computers is dangerous and must be stopped. In the past, whenever State or Federal law enforcement agents arrested a child pornographer, or ring of child pornographers, they seized and then destroyed the child pornography. This kept child pornography out of the hands of child molesters and preserved the privacy of the children who had been so callously exploited. *But now, because of digital computer technology, it is nearly impossible to actually destroy child pornography. That means there will be more child pornography for child molesters and less privacy for abused children.* We in Congress must do something.

H.R. 1240 and the Grassley Hatch Thurmond amendment would discourage child pornographers from using computers to trade in child pornography. And when the U.S. Sentencing Commission reports to us this fall on how computer child pornographers are being punished, I will take a close look to see if there is anything the Senate can do to provide even more protection to children.

141 Cong. Rec. S5509-02. (emphasis added).

HR 1240, 109 Stat. 774.   SCACPA specifically asked the Commission to consider modifications of guidelines relating to child pornography offenses, and to conduct "a survey of recidivism rate for offenders convicted of committing sexual crimes against children, an analysis of the impact on recidivism of sexual abuse treatment provided during or after incarceration or both, and an analysis of whether increased penalties would reduce recidivism for these crimes."   *Id*.   The Commission conducted this review and presented its report in June 1996.   That review further demonstrates the Commission's analytical contribution to the formation of the guidelines for child pornography sentencing.   *Id*.

Congress then passed the Prosecutorial Remedies and Tools against the Exploitation of Children Today Act ("the PROTECT Act") in 2003.   Pub.L. 108-21, 2003 S 151.   In formulating the PROTECT Act, the Judiciary Committee heard extensive testimony that addressed child pornography issues and the technological changes in its production and dissemination.   S. Rep. 108-002.[4]

In 2004, the Commission substantially amended the child pornography sentencing guidelines to include the Congressionally mandated enhancements, including the number of images enhancement, as well as to ensure that, in light of the PROTECT Act, these sections continued to assign proportional punishment to possession, receipt, transportation, and

---

[4] The Judiciary Committee heard testimony from Daniel P. Collins, Associate Deputy Attorney General and Chief Privacy Officer, United States Department of Justice; Frederick Schauer, Professor of Law, John F. Kennedy School of Government, Harvard University; Anne M. Coughlin, Professor of Law, University of Virginia School of Law; and Daniel S. Armagh, Director, Legal Resources Division, National Center for Missing and Exploited Children.   At that time, the Committee also considered the evidence and testimony presented on June 4, 1996, during the hearing on the Child Pornography Prevention Act of 1996, detailing the problems of child pornography and the technological changes in the production and dissemination of these materials.

distribution of child pornography.  Pub.L. 108-21, 2003 S 151, at 671.  For example, the

Commission decided to consolidate § 2G2.4 and § 2G2.2 of the guidelines, explaining that

> Consolidation addresses concerns raised by judges, probation officers, prosecutors, and defense attorneys regarding difficulties in determining the appropriate guideline (§ 2G2.2 or § 2G2.4) for cases involving convictions of 18 U.S.C. § 2252 or § 2252A.  Furthermore, as a result of amendments directed by the PROTECT Act, these guidelines have a number of similar specific offense characteristics.

*U.S. Sentencing Guidelines Manual*, App. C, Amendment 664 (2004).  The Commission also

increased the base level offense for possession of child pornography to 18, something that also

was not a Congressional directive.  *Id.*  The Commission apparently considered one of the

directives, a change to the number of images enhancement, to be a wise change because it

created Application Note 4 to § 2G2.2, which provides two possible grounds for an upward

departure: "if the number of images substantially under represents the number of minors or if

the length of the videotape or recording is substantially more than five minutes."  *U.S.*

*Sentencing Guidelines Manual*, App. C, Amendment 664 (2004).  The Commission further

included in Application Note 4, that video clips should be counted as a minimum of 75

images.  *Id.*  Thus, not only did the 2004 revisions to § 2G2.2 result from thorough

Congressional study, but the revisions once more underscored that the guidelines concerning

child pornography offenses were shaped by more than unfettered political force.


Since 2004, Congress has continued to monitor the evolution of child pornography

offenses, particularly given the continuing expansion of the Internet and evolving

technological issues that shape the production and dissemination of child pornography.  The

information it has reviewed reinforces its identification of the Internet as the new frontier in

the trading, viewing, and receiving of images of child pornography.  For instance, in 2006,

the House Committee on Energy and Commerce held nine days of hearings addressing child pornography, child safety and the internet.  In January 2007, that Committee received a bipartisan staff report on the Sexual Exploitation of Children over the Internet. The report makes several findings, including that:

(i) The sexual exploitation of children over the Internet is increasing due to the ease with which pedophiles and child predators can trade, sell, view and download images of child porn over the internet;

(ii) The number of sexually exploitative images of children over the Internet is increasing, the victims are becoming younger, and the substance of the images is growing more violent;

(iii) Commercial web sites are growing, and that this is likely to be a multi-billion dollar-a-year industry;

(iv) The use of digital photography and web cameras, the ability to communicate anonymously over the internet, the use of electronic payments, the limited retention of Internet Protocol ("IP") data linked to a subscriber; and the unclear reporting requirements for social networking web sites and web hosting companies all limit enforcement of existing laws and enable the spread of child pornography.

Sexual Exploitation of Children Over the Internet, January 2007.  Indeed, data tracked by the National Center for Missing and Exploited Children (NCMEC) verifies that, far from diminishing, the number of images of children in circulation on the Internet has been growing exponentially since NCMEC began its Child Victim Identification Program in 2002, pursuant to 42 U.S.C. § 5773.  Since 2002, law enforcement agencies have been required to provide seized images to NCMEC for analysis.  In addition to this analysis, NCMEC is charged with assisting law enforcement in locating and rescuing child victims who have not yet been identified.  In 2002, when the program began, NCMEC analyzed 8,643 images or videos each week.  Currently, NCMEC analyzes an average of 143,000 seized images and videos each week.  Moreover, the total number of identified victims and identified series continues to

grow, from 95 identified victims and 73 identified series in 2002 to 1247 identified victims and 832 identified series in 2007.

The full legislative history clearly demonstrates that Congress and the Commission have, in their respective institutional capacities, devoted extensive resources to the development of child pornography penalties.   Congress has sought out and reviewed testimony of victims, offenders, law enforcement officers, prosecutors, and First Amendment scholars, as well as numerous empirical studies, addressing the harms caused by child pornography and the penalties necessary to eradicate it.  Based on this information, Congress has several times enacted laws manifesting its evolving understanding of the harms of child pornography and the effectiveness of criminal sanctions.   The Commission has, in turn, committed extensive resources to gathering data on sentencing practices for Congress and to identifying guidelines that rationalize and remove disparities in sentencing practices, while conforming to Congressional directives.   The following chart summarizes the contributions of Congress and the Commission to the formation of § 2G2.2:

**Distribution/Receipt of Child Pornography:**

| Base Offense Level | 13 | Commission 1987 |
|---|---|---|
| Base Offense Level | 15 | Congress 1991 |
| Base Offense Level | 17 | Congress 1996 |
| Base Offense Level | 20/22 | Commission, to comport with Congressional mandatory minimum, 2004 |

**Possession of Child Pornography:**

| | | |
|---|---|---|
| Base Offense Level | 10 | Commission 1991 |
| Base Offense Level | 13 | Congress 1991 |
| Base Offense Level | 15 | Congress 1996 |
| Base Offense Level | 18 | Commission, to comport with Congressional mandatory minimum, 2004 |

**Specific Enhancements:**

| | |
|---|---|
| Distribution for pecuniary gain | Commission 1987 |
| Distribution for thing of value | Congress 2000 |
| Distribution to a minor | Commission 2000 |
| Distribution to persuade minor to engage in sexual conduct | Commission 2000 |
| Image of a prepubescent minor or minor under 12 | Commission 1987, 1988 |
| Sadistic/masochistic images | Commission 1990 |
| Pattern of Abuse | Congress 1991 |
| Use of computer | Congress 1996 |
| Number of images | Congress, 1991, 2003 |

1987 U.S. Sentencing Guideline Manual; U.S. Sentencing Guideline Manual, App. C, Amendments 31, 325, 435, 436, 537, 592, 649, 664 (1998-2004); Treasury, Postal Service and General Government Appropriations Act of 1992, Pub.L. 102-141, 1991 HR 2622; Sex Crimes Against Children Prevention Act of 1995, Pub. L. 104-71, 1995 HR 1240, 109 Stat. 774; Protection of Children from Sexual Predators Act of 1998, Pub.L. 105-314; The PROTECT Act of 2003, Pub.L. 108-21, 2003 S 151.

In summary, the defendant's argument that the child pornography guidelines should be ignored in the present case is without merit. Through research, analysis, and public hearings, it is clear that Congress and the U.S. Sentencing Commission carefully analyzed the

problem of sexual exploitation of children, and cooperatively developed the present day §

2G2.2.  It is true that Congress occasionally has utilized its authority to set criminal penalties

by directing the Commission to add or modify an enhancement, but such a directive is an

appropriate exercise of Congressional authority.  Since the guidelines were originally enacted,

Congress has become far more educated about these crimes through the examination of

studies and research that have reflected the previously unknown information, including the

seriousness of these pornography crimes; the ongoing, significant, detrimental effect on

children when their images are continually propagated online; and the significant likelihood

that child pornographers are often engaging in contact offenses, something that cannot be

known until the offender has completed a significant amount of sex offender treatment

conducted by an experienced provider.   With this knowledge, Congress has repeatedly

increased the statutory penalties for these crimes and has worked with the Sentencing

Commission to develop appropriate sentencing guidelines.  Although the history behind the

development of the sentencing guidelines might not be equivalent to the development of other

guidelines, Congress and the Commission have properly formulated the child pornography

guidelines.

**B.  The Sentencing Guidelines Increase Punishment Commensurate with Increasingly Depraved Conduct.**

The defendant contends that the sentencing guidelines in this case are "duplicative and

thus unjustly punitive."  He, however, does not contest that the enhancements apply.  The

defendant's base offense level is high because child pornography is a crime of violence and

Congress has recognized as much.  The guidelines are high in child pornography cases when

and only when the defendant has engaged in very serious conduct that the guidelines

recognize by applying enhancements.  Put differently, the enhancements increase punishment with increasingly depraved conduct.

Here, the defendant engaged in disturbing conversations with a thirteen year old girl where he discussed raping a toddler.  The defendant distributed images depicting prepubescent children enduring horrifying sado-masochistic abuse, including one being orally penetrated by an adult male penis and yet another of a child with semen on her face.  That defendant is one of many who receive these enhancements does not weigh in favor of a variance – it should, instead, be increasingly alarming to the Court that so many similarly-situated defendants are presenting with frequency.

**C. Neither *United States v. Dorvee* Nor Its Progeny Support Defendant's Requested Downward Variance.**

The defendant relies on *United States v. Dorvee* and *United States v. Jenkins* to support his request for a significant downward variance of 60 to 72 months.  But neither case supports such a v.  In fact, after remand, the district court in *Dorvee* sentenced the defendant to 121 months imprisonment — 49 months more than the high end of the range defendant is requesting.  *Jenkins* in inapposite to the defendant's case because there, the defendant did not distribute child pornography.  Even so, the *Jenkins* court sentenced the defendant to 144 months imprisonment.  Accordingly, neither *Dorvee* nor *Jenkins* support the substantial downward variance the defendant requests, and, as such, the government contends that the defendant should be sentenced to a significant term of imprisonment.

#### IV.     18 U.S.C § 3553 DOES NOT WEIGH IN FAVOR OF THE SIGNIFICNAT VARIANCE DEFENDANT REQUESTS.

The United States recognizes that since *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are advisory rather than statutorily mandated.  When imposing a sentence, however, the Court is required to consider the guidelines, but must fashion a sentence that is consistent with the factors detailed in 18 U.S.C. § 3553(a).  As noted by the Supreme Court, the guidelines have a "real and pervasive effect … on sentencing" and therefore, "are not only the starting point for most federal sentencing proceedings but also the lodestar."  *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).  The United States contends that a sentence of 60-72 months is unreasonable and inappropriate even in light of the factors set forth in 18 U.S.C. § 3553(a).

Under Section 3553(a), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.  See *United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) ("In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress .... It bears noting that the Sentencing Commission is an expert agency whose statutory charge mirrors the § 3553(a) factors that the district courts are required to consider.").  The sentencing court must also consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  A court that imposes a sentence outside the applicable advisory guidelines range must do so on notice to the parties and must

state "with specificity" both at sentencing and in the written judgment and commitment order its reasons for doing so.  18 U.S.C. § 3553(c).

Based on the § 3553(a) factors, as set forth below, the government opposes defendant's request for the downward variance and contends that the Court should impose a significant term of imprisonment.

**A. The Nature and Circumstances of the Offense Do Not Support Defendant's Request for a Downward Variance.**

The defendant argues that the nature and circumstances of the offense support his request for an enormous downward variance.  He is incorrect.  The defendant relies on his difficult upbringing — which was, by comparison to the scores of defendant this Court sees, a Norman Rockwell scene — and the fact that his "conduct was all online" for support.  *See* Docket No. 34 at 18.  Indeed, the defendant begs this court to correlate a difficult upbringing to child pornography.  This logical fallacy fails when we consider the number of people in this country who endure difficult childhoods and, yet, do not seek out and distribute child pornography.  They do not engage in horrific conversations about raping toddlers with thirteen year olds.

The government is especially troubled by the defendant's argument that he seemingly deserves a prize because his conduct was all online.  The defendant states that he "committed his offense from the isolation of the motor home parked next to his father's home, the motor home to which he had been exiled when he was rejected by stepmother.  Feeling very alone, unloved, and intimated at the thought of rejection by another woman, he used social media

to connect to a person in an age group he saw as less threatening to him." *See* Docket No. 18. To be clear, the defendant was 23-years old when he committed this crime. He was not a child. He was not even a teenager. He was a full-fledged adult. If the defendant felt exiled — so much so that it compelled him to commit this grievous offense — he could have and should have moved out. If the defendant felt so alone and unloved — he could have and should have sought a legal, age-appropriate relationship (notably, as he had done in the past). None of this even comes close to justifying the defendant's conduct in this case and his attempt to pull at the Court's heartstrings (while simultaneously minimizing his conduct) falls flat.

Likewise, the defendant makes the shocking assertion that he "has not engaged in predatory behavior as an adult with any child or other adult." Docket No. 34 at 19. It is unclear to the government how the defendant's conduct with Minor Victim 1 does not fall into the category of "predatory behavior." He further contends that this was merely a "short term relatively isolated incident." Docket No. 34 at 24. The government equally struggles with this assertion given the fact that he admitted to abusing his sister – which he disturbingly refers to as "curiosity-driven sexual exploration." Docket No. 34 at 24. The accurate term for the conduct with his sister is sexual abuse.

At bottom, this is a defendant who has demonstrated a sexual interest in very young children. In fact, the defendant has acted on that interest when he abused his younger sister in directing her to undress as he masturbated. He acted on that interest again when he engaged a thirteen-year-old in disturbing sexual conversations and directed her to film herself

22

abusing other young girls.  That he now demonstrates a "genuine and authentic commitment to continuing the treatment process" — after getting caught — does not change the calculus. Accordingly, the nature and circumstances of the offense do not warrant the substantial downward variance the defendant requests.

**B. The Need for the Sentence Imposed to Reflect the Seriousness of the offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense Does Not Support Defendant's Request for a Downward Variance.**

The defendant contends that "[f]or a first-time offender like Mr. Notto, who has none of the characteristics that are indicative of a predatory or recidivist, any sentence substantially longer than [] the five-year mandatory minimum term of imprisonment would, we submit, be greater than necessary to meet the goals of § 3[553(a)(2)]."  Docket No. 34 at 20.  This contention runs contrary to the sentences imposed in both *Dorvee* and *Jenkins*.

Furthermore, the defendant also argues that "[p]unishment for individuals convicted of child pornography offenses is often far more severe than for almost any other crime — including murder."  Docket No. 34 at 20.  There is a reason that Congress penalized child pornography as stringently as it did:  it is an absolutely horrific, insidious, violent crime. Every single image depicts the literal and figurative ruin of a child.  The defendant essentially asks the Court to overlook this fact and minimizes his conduct in doing so.  That the defendant does not believe his conduct was as egregious as the law does not warrant the downward variance he requests.

With respect to deterrence, the defendant makes the unavailing argument that since he has been caught and "on fairly strict pretrial supervision" "he has not re-engaged in any type of deviant sexual behavior and he [] has fully invested himself in the treatment process." Docket No. 34 at 20.  Pursuant to his pretrial supervision, the defendant has not (or at least was not supposed to) have the opportunity to reoffend.  But he has not fully complied with this pretrial supervision and has violated the terms of his release on more than one occasion. This disregard for the law exemplifies that the defendant is not entitled to the large downward variance he requests.

**C.  The Need to Avoid Unwarranted Sentence Disparity Among Defendants Does Not Support Defendant's Request for a Downward Variance.**

The defendant makes the bold statement that "[i]t is also a conundrum as to why some defendants are dealt with more leniently than others when they have engaged in very similar conduct, and sometimes in even more egregious conduct."  Docket No. 34 at 21.  The defendant then references three cases out of the Western District of New York that he contends received a better bargain.  As this Court knows, the United States Attorney's Office charges cases as it sees fit based on the facts and circumstances of the individual case along with the applicable law.

What is more, the cases the defendant references are distinguishable from his.  In *United States v. Garigen*, the government charged the defendant via criminal complaint with receipt and access with intent to view — not distribution and certainly not enticement of a minor.  *United States v. Brett Schultz* involved enticement of a minor, but also involved an

24

11(c)(1)(C) plea.   Finally, although *United States v. Myers* involves receipt of child pornography, different enhancements applied in that case.   For example, neither the prepubescent nor the sado-masochistic enhancements applied.

The defendant was charged with enticement of a minor.   He was offered a plea to the production of child pornography.   He accepted that plea.   He cannot cry foul now because he thinks he could have had a better deal with a different prosecutor in the same office.

<u>**CONCLUSION**</u>

For all the reasons stated above, the government opposes the defendant's request for the substantial downward variance of 60-72 months.   This defendant should be sentenced to a significant term of imprisonment, consistent with *Dorvee* and *Jenkins*.

DATED:  Buffalo, New York, September 1, 2020.

JAMES P. KENNEDY, JR.
United States Attorney

BY:     **/S/ CAITLIN M. HIGGINS**
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York  14202
716/843-5818
Caitlin.Higgins@usdoj.gov